Filed 3/24/14  P. v. Barker CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SCOTT JOSEPH BARKER,<br><br>    Defendant and Appellant. | B247708<br><br>(Los Angeles County<br>Super. Ct. No. SA074933) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Elden S. Fox, Judge.  Affirmed.

Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and Connie H. Kan, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Scott Joseph Barker appeals from the judgment entered following a jury trial in which he was convicted of first degree murder committed while using a deadly and dangerous weapon (i.e., knife) and lying in wait. (Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(15), 12022, subd. (b)(1).)[1] He was sentenced to prison to life without possibility of parole, plus one year for the use enhancement.[2]

Appellant contends the trial court erred in refusing to instruct the jury on voluntary manslaughter based on provocation. He contends the court erred in failing to instruct on the defense of voluntary intoxication and, alternatively, his counsel was ineffective for failing to request such instruction. He further contends the jury was improperly instructed on the elements of lying in wait murder and the lying in wait special circumstance and his counsel was ineffectual for failing to request a corrective modified instruction. He also challenges the sufficiency of the evidence to sustain his conviction for lying in wait murder and the lying in wait special circumstance.

We affirm the judgment. The trial court did not err in failing to instruct on the lesser included offense of voluntary manslaughter, because appellant was either guilty of murder or not guilty at all. Defense counsel was not ineffective for failing to request instruction on voluntary intoxication or a modified instruction on lying in wait murder or the lying in wait special circumstance. Instruction on voluntary intoxication was unsupported by the evidence, and the trial court properly instructed the jury on the

[1]     All further section references are to the Penal Code.

[2]     The clerk's transcript recites the trial court sentenced appellant to 25 years to life without possibility of parole, plus one year for the knife use enhancement. In contrast, the reporter's transcript reflects after noting the sentence for first degree murder was 25 years to life, the court correctly sentenced him to life without possibility of parole based on the lying in wait special circumstance finding (§190.2, subd. (a)(15)), plus the one-year enhancement. "As a general rule, a record that is in conflict will be harmonized if possible. (*People v. Smith* (1983) 33 Cal.3d 596, 599.) If it cannot be harmonized, whether one portion of the record should prevail as against contrary statements in another portion of the record will depend on the circumstances of each particular case. (*Ibid.*)" (*People v. Harrison* (2005) 35 Cal.4th 208, 226.) We deem the reporter's transcript to be the accurate record.

elements of lying in wait murder and the lying in wait special circumstance. Substantial evidence supports appellant's conviction of lying in wait murder and the lying in wait special circumstance finding.

## BACKGROUND

Codefendant Chie Coggins-Johnson (Chie) had led a tumultuous life prior to the killing of Katsutoshi Tony Takazato (Tony), with whom, since high school, she had an on-and-off romantic relationship. After breaking up, Chie began dating him again toward the end of 2008. In December 2009, Chie moved into Tony's house. Tony, who had physically and sexually abused Chie during their past relationships, continued to do so and compelled Chie to work as a prostitute and pose in pornographic pictures.

In May 2010, Chie met appellant. At this time, Chie, who still lived with Tony, told appellant the house belonged to her cousin. Sometime later, she and appellant began dating. Their relationship was stormy. Appellant regularly drank alcohol and became aggressive at times. He first learned about Tony on June 8, 2010, when Chie called Tony to wish him a happy birthday. When she said he was a friend, appellant became irritated she was talking to another male.

In July 2010, appellant, who was about to be evicted from his apartment, suggested he and Chie should move in with his brother in Florida. Chie agreed. On July 15, 2010, she told him she had been living with Tony but would not go back. She related Tony had abused her physically and sexually and he had her work as a prostitute and pose in pornographic photographs. Appellant responded he could not believe someone would do this to "the person I'm in love with, my wife."

On July 16, 2010, appellant woke up and told Chie, who had stayed the night at his apartment, that he did not sleep because he was thinking about Chie's relationship with Tony. They discussed marriage and decided to move to Florida together on July 23, 2010. Chie told him she wanted to say goodbye to her family and friends and to see Tony before they left. Appellant was upset she wanted to see Tony. They continued to argue, because he was still upset about what Tony had done to Chie.

3

On July 19, 2010, during the afternoon, Chie and appellant argued, because she felt he was not allowing her to see her friends before they moved away. While at a barbeque in a friend's apartment that evening, Chie began having second thoughts about moving to Florida. Appellant and she argued about moving to Florida. About 3:00 a.m., appellant, who had been drinking at the barbeque, said he wanted to leave, although he normally remained to the end of a party. Chie drove him back to his apartment in his car, because he was too intoxicated to drive. He was "a bit drunk" but not "falling down drunk."

About 5:00 a.m. on July 20, 2010, appellant, who wore a black thermal shirt, black shorts, black socks, sneakers, and a black cap, woke up Chie and said he wanted to go for a ride. Apparently irritated when she resisted, he pulled her out of bed, and they got into his car, a Volkswagen Jetta. He went back inside to get something and returned wearing black gloves and with a duffel bag. Appellant did not respond when she asked where they were going and why he had these items.

Upon arriving at Tony's house, appellant parked at the bottom of the long driveway, exited, and retrieved the duffel bag from the back seat. From the bag, he pulled out a large knife, which had been in his kitchen and placed a dark scarf below his nose and around his mouth. When Chie asked what he was doing, appellant responded he was going to scare Tony. He refused her request to leave. Chie tried to hide the knife between her seat and the passenger door, but appellant found it.

Appellant pulled Chie from the car and walked her toward the house. He ignored her efforts to convince him to leave. After Chie refused his request to enter the gate code, appellant directed her to climb the fence, which she did. He then climbed over and escorted her to the rear of the house. When he could not get the glass door opened, he took her to the carport area near Tony's bedroom window. Chie usually would knock on the window and Tony would let her enter through the carport door. Appellant instructed her to knock on the window, ask Tony to let her inside, and act normal. During this time, appellant continually held the knife.

4

While appellant was concealed in the carport area, Chie knocked on the window. Tony showed up, and Chie asked him instead to meet her at the front door, which he did. When asked why she was there, she responded appellant was outside and advised him to stay inside and lock the door, because she did not want them to fight. She did not tell Tony appellant had a knife. At her request, Tony opened the gate with a remote control, returned inside, and shut the front door. Looking back as she walked down the driveway, Chie saw appellant pacing the carport area.

Once inside, Tony asked Taeko Kawasaki, his housekeeper, to wake him at 8:00 a.m., and went into his bedroom. Kawasaki went to her bedroom. Upon hearing a "bam bam" sound like a struggle taking place, she opened the door connecting the house to the carport. She saw Tony, who was held from behind by a man and struggling, being stabbed with a knife. A cap covered the assailant's face. Tony was screaming and called out twice, "stop, Eddie, stop." Kawasaki, whose English was poor, later clarified Tony had said something about "ending" or "end it" rather than "stop, Eddie, stop."

Meanwhile, as Chie was walking down the driveway, she heard two voices arguing from the direction of the house. A voice, which sounded like Tony's, said, "what the f[uck]. What the f[uck]. What the f[uck]." She also heard a female screaming. Chie got into appellant's car and began to drive off. As she drove back towards Tony's house, she observed appellant, who had removed his shirt and scarf, in the middle of the street holding the knife, which was wrapped in his shirt. After getting into the car, appellant unwrapped the knife, which was bent at the tip. There was blood on his chest. He told Chie "[h]e was a pussy. He was easy." He told Chie to remain calm and drive to Malibu.

During this time frame, two neighbors, Azra and David Zarrinpar, while on their usual morning walk, heard screaming and what sounded like a struggle emanating from Tony's house. As they neared the house, a girl went down the driveway, got into a car parked in front, and drove off. A shirtless man then climbed over Tony's fence and ran down the street in the opposite direction taken by the car. The man wore shorts and held something in his hand. A knit hat covered his face. After driving off, the car returned and proceeded in the man's direction.

5

After Chie drove the car to a private Malibu beach where they had been before, appellant removed his clothing, except his underwear. From the car trunk, he retrieved a change of clothing, which was in the duffel bag, and a plastic "Ralphs" bag. He told Chie the second knife in the back seat was the one he had wanted to use. Appellant went into the ocean with the knife and clothing he had been wearing. Upon his return, he placed the wet clothing and knife into the plastic bag and changed into his clean clothes.

Appellant then directed Chie to drive to a turnout in Malibu Canyon and pull over. Once there, he exited the car and made two trips from the car down the hillside, leaving the two knives, the plastic bag with the wet clothing, and the car's floor mats somewhere down the hill. In between trips, he wiped down the car's interior. Upon noticing two blood spots on the carpet, he burned one spot with a lighter and cut out the second with a pocket knife.

As appellant drove back to his apartment, he told Chie to remember where they had stopped, because he needed to return and bury the items left there. She remembered the location because of a nearby sign. En route to the apartment, appellant threw the duffel bag into a trash can.

Upon their arrival, the paramedics found Tony, who was dead, lying face down in a pool of blood in the carport area. Tony's hand was gripping a piece of black cloth. Tony, who sustained a total of 58 stab wounds and cuts, died from multiple stab wounds. The one to his heart was immediately fatal. A wound to the top of his skull may have bent the knife.

Pursuant to a plea bargain, Chie pleaded no contest to assault with a deadly weapon and was placed on felony probation for five years. She agreed to testify against appellant and to direct the police to the location in Malibu Canyon where certain evidence was hidden. She led the police to that location. She also walked the police through the crime scene and wrote a detailed statement of the events leading up to the killing of Tony; and made drawings of the knives.

During the search of the Malibu Canyon location, police recovered various items hidden in a pile under bushes down the hillside, i.e., two knives, one with a bent tip; four

6

black rubber floor mats from a Volkswagen Jetta; a black knit cap; a ripped black thermal shirt; a black and white scarf; black fingerless gloves; black basketball shorts; black socks; a blue T-shirt; a pair of boxer shorts; a pair of Nike shoes; and a Ralphs grocery bag. The fabric found in Tony's hand was consistent with having been ripped from the black thermal shirt. The shoe prints at the crime scene were consistent with the soles of the shoes found at the Malibu Canyon site.

The People's DNA expert opined appellant wore the hat, glove and shoes recovered at that site.

Appellant, who did not testify, presented evidence attacking Chie's credibility and character evidence favorable to himself.

DISCUSSION

1. *Refusal to Instruct on Provocation Voluntary Manslaughter Not Error*

Appellant contends the trial court committed reversible error by refusing his request for instruction on voluntary manslaughter arising from provocation. No error occurred.

"'In criminal cases, even absent a request, the trial court must instruct on general principles of law relevant to the issues raised by the evidence. [Citation.] This obligation includes giving instructions on lesser included offenses when the evidence raises a question whether all the elements of the charged offense were present, but not when there is no evidence the offense was less than that charged. (*Ibid.*) The trial court must so instruct even when, as a matter of trial tactics, a defendant not only fails to request the instruction, but expressly objects to its being given.'" (*People v. Moye* (2009) 47 Cal.4th 537, 548 (*Moye*).) Such instruction is warranted only if "'there is evidence which, if accepted by the trier of fact, would absolve [the] defendant from guilt of the greater offense' [citation] *but not the lesser.*" (*People v. Memro* ( 1995) 11 Cal.4th 786, 871.) "[T]he trial court need not instruct on a lesser included offense whenever *any* evidence, no matter how weak, is presented to support an instruction, but only when the evidence is substantial enough to merit consideration by the jury. [Citation.]" (*People v. Barton* (1995) 12 Cal.4th 186, 195, fn. 4.) "'"[S]peculation is an insufficient basis upon which to

7

require the giving of an instruction on a lesser included offense."' [Citations.]" (*People v. Valdez* (2004) 32 Cal.4th 73, 116.)

"""Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) A defendant who commits an intentional and unlawful killing but who lacks malice is guilty of . . . voluntary manslaughter. (§ 192.)" [Citation.] Generally, the intent to unlawfully kill constitutes malice. [Citations.] "But a defendant who intentionally and unlawfully kills lacks malice . . . in limited, explicitly defined circumstances[, such as] when the defendant acts in a 'sudden quarrel or heat of passion' (§ 192, subd. (a))."''" (*Moye, supra*, 47 Cal.4th at p. 549.) "'Because heat of passion . . . reduce[s] an intentional, unlawful killing from murder to voluntary manslaughter by *negating the element of malice* that *otherwise inheres* in such a homicide [citation], [such] voluntary manslaughter . . . is considered a lesser necessarily included offense of intentional murder [citation].' [Citation.]" (*Ibid.*)

"'[T]he factor which distinguishes the "heat of passion" form of voluntary manslaughter from murder is provocation. The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim. [Citations.] The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.]' [Citation.]

"To satisfy the subjective element of this form of voluntary manslaughter, the accused must be shown to have killed while under 'the actual influence of a strong passion' induced by such provocation. [Citation.] 'Heat of passion arises when "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." [Citations.]' [Citation.] "'However, *if sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing*

8

*is not voluntary manslaughter. . . .*" [Citation.]' [Citation.]" (*Moye*, *supra*, 47 Cal.4th 537, 549-550, italics added.)

"Generally, it is a question of fact for the jury whether the circumstances were sufficient to arouse the passions of the ordinarily reasonable person." ( *People v. Fenenbock* (1996) 46 Cal.App.4th 1688, 1705.) On the other hand, the court may decide the issue of adequate provocation if "the provocation is so slight . . . that reasonable jurors could not differ on the issue of adequacy." (*Ibid*.)

The record does not reflect sufficient evidence of legal provocation that would compel instruction on voluntary manslaughter. Appellant arrived at the scene fully prepared to knife Tony and flee undetected. That he intended to, and did in fact, kill Tony with premeditation, deliberately, and intentionally is reflected also by the fact he hid in Tony's carport and jumped Tony unawares from behind. He stabbed Tony a total of 58 times. The force he used was sufficient to bend the tip of the knife. He admitted that he actually intended to use the second knife he had brought to the crime scene. These facts evidence appellant's killing of Tony was based on appellant's premeditation, and deliberation rather than the product of "'the actual influence of a strong passion' [citation] in response to legally sufficient provocation, such as caused him to '"act rashly or without due deliberation and reflection, and from this passion rather than from judgment"' [citation]." (*Moye*, *supra*, 47 Cal.4th at p. 553; see also *People v. San Nicolas* (2004) 34 Cal.4th 614, 658-659 [deliberation and inference of premeditation based on manner of killing, e.g., "sheer number of wounds"].)

2.     *Voluntary Intoxication Instruction Unsupported by Evidence*

Appellant contends the judgment must be reversed, because the trial court failed to instruct on voluntary intoxication. The evidence does not support such instruction.

Initially, we point out the trial court has no duty sua sponte to instruct on voluntary intoxication. (*People v. Castillo* (1997) 16 Cal.4th 1009, 1013.) Moreover, voluntary intoxication is not a defense which operates to absolve a defendant of what otherwise would be the crime of murder. "Evidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged, including, but not

9

limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act." (Former § 22, subd. (a), now § 29.4, subd. (a).)[3] Rather, "[e]vidence of voluntary intoxication is admissible solely on the issue . . . when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." (§ 29.4, subd. (b).) In other words, such evidence is "admissible solely on the issue of whether or not the defendant *actually* formed a required specific intent, premeditated, deliberated or harbored express malice aforethought, when murder or a specific intent crime is charged." (Use Note to CALJIC No. 4.21 (2008 Fall ed.) p. 170, italics added.)

The defense may request instruction on involuntary intoxication for this purpose. "'[A] defendant has a right to an instruction that pinpoints the theory of the defense [citations]; however, a trial judge must only give those instructions which are supported by substantial evidence. [Citations.] Further, a trial judge has the authority to refuse requested instructions on a defense theory for which there is no supporting evidence.' [Citation.] 'A party is not entitled to an instruction on a theory for which there is no supporting evidence.' [Citation.] [¶] . . . Accordingly, a defendant is entitled to an instruction on voluntary intoxication 'only when there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's "actual formation of specific intent."' [Citation.]" (*People v. Roldan* (2005) 35 Cal.4th 646, 715, overruled on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

The evidence reflects that during the daytime, appellant would sometimes consume cocaine and marijuana. He also drank alcoholic beverages regularly and when he did, he became aggressive but his personality did not change. During the barbeque party the night of the murder, appellant was intoxicated from drinking. About 3:00 a.m., Christopher Pang heard him tell Chie to drive them home, because he felt he was too drunk to drive. Pang testified appellant was not "falling down drunk." No evidence was

---

3        On January 1, 2013, section 22 was renumbered section 29.4. (Stats. 2012, ch. 162, § 119, p. 2617; see also *People v. Rios* (2013) 222 Cal.App.4th 704, 725, fn. 9.)

10

presented that appellant had consumed any alcohol or drugs after leaving the party and before he drove Chie to Tony's house and stabbed Tony to death 58 times about three hours later. In the face of such minimal intoxication evidence, no instruction on voluntary intoxication is proper.

3. *Lying In Wait Murder and Special Circumstance Instruction Proper*

Appellant contends the jury was misinstructed as to the elements of lying in wait murder and the lying in wait special circumstance allegation. We find the instruction given to be proper.

In pertinent part, the trial court instructed the jury on lying in wait murder as follows: "Murder which is immediately preceded by lying in wait is murder of the first degree. [¶] The term 'lying in wait' is defined as a waiting and watching for an opportune time to act, together with a concealment by ambush or by some other secret design to take the other person by surprise even though the victim is aware of the murderer's presence. The lying in wait need not continue for any particular period of time provided that its duration be substantial, that is, an amount of time that shows the killer had a state of mind equivalent to premeditation or deliberation." This instruction tracks "CALJIC 8.25 Murder by Means of Lying in Wait (2008 Fall ed.)."

Similarly, in pertinent part, the court instructed on the lying in wait special circumstance as follows: "To find that the special circumstance referred to in these instructions as murder by means of lying in wait is true, each of the following facts must be proved: [¶] 1. The defendant intentionally killed the victim; and [¶] 2. The murder was committed by means of lying in wait. [¶] Murder which is immediately preceded by lying wait is a murder committed by means of lying in wait. [¶] The term 'lying in wait' is defined as a waiting and watching for an opportune time to act, together with a concealment by ambush or by some other secret design to take the other person by surprise even though the victim is aware of the murderer's presence. The lying in wait need not continue for any particular period of time provided that its duration be substantial, that is an amount of time that shows the killer had a state of mind equivalent

11

to premeditation or deliberation."[4]  This instruction tracks "CALJIC 8.81.15.1 Special Circumstances—Murder by Lying in Wait (2008 Fall ed.)."

Appellant challenges these instructions as ambiguous and because "rather than requiring that the murder be committed 'by means of' lying in wait [citation], these instructions erroneously state that the murder must be 'immediately preceded by' lying in wait."  He contends "the jury likely misconstrued these instructions to mean that it could convict appellant of first degree murder on a lying in wait theory and find true the lying in wait special circumstance as long as there was a 'secret design' to take Tony by surprise that 'immediately preceded' the killing . . . even if Tony was not actually taken by surprise or attacked form a position of advantage."  We disagree.

In *People v. Russell* (2010) 50 Cal.4th 1228, our Supreme Court upheld the identical lying in wait murder instruction as "adequate" and explained:  "Section 189 provides, in pertinent part, that 'murder which is perpetrated by . . . lying in wait . . . is murder of the first degree.' Lying-in-wait murder consists of three elements:  ""(1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage . . . .' [Citations.]"' [Citation.]  We have repeatedly held that CALJIC No. 8.25 adequately conveys to a jury the elements of lying-in-wait murder. [Citations.]" (*Id.* at p. 1244, fn. omitted.)

Instruction given here on the "by means of lying in wait" element of the lying in wait special circumstance is identical to that set forth in CALJIC No. 8.25.  We are

---

**4**      In *People v. Poindexter* (2006) 144 Cal.App.4th 572, the court noted: "Proposition 18 (Stats.1998, ch. 629, § 2, enacted as Prop. 18, approved by voters, Primary Elec. (Mar. 7, 2000) eff. Mar. 8, 2000) changed the word 'while' lying in wait in the special circumstance to 'by means of,' conforming that part of the definition with lying-in-wait first degree murder, arguably 'to essentially eliminate the immediacy requirement that case law had placed on the special circumstance.' [Citation.]  The special circumstance requirement that the defendant *intentionally* kill the victim continues to distinguish the special circumstance from first degree murder under a lying-in-wait theory.  Lying-in-wait first degree murder 'requires only a wanton and reckless intent to inflict injury likely to cause death.' [Citations.]" (*Id*. at p. 580, fn. 10.)

unaware of any reason to find such instruction to be inadequate or erroneous and therefore conclude CALJIC No. 8.81.15.1 is adequate to instruct the jury on the element of "by means of lying in wait" of the lying in wait special circumstance.

4.    *No Ineffective Assistance of Counsel Shown*

Appellant contends his counsel was ineffective, because he failed to request instruction on voluntary intoxication and a corrective, modified instruction on both lying in wait murder and the lying in wait special circumstance allegation. He has failed to carry his burden.

"The law regarding claims of ineffective assistance of counsel is settled. Defendant must show that counsel's performance was both deficient and prejudicial, i.e., that it is reasonably probable that counsel's unprofessional errors affected the outcome. [Citations.] [I]f the record sheds no light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for an explanation and failed to provide one, or there could be no satisfactory explanation for counsel's performance. [Citation.]" (*People v. Castillo*, *supra*, 16 Cal.4th 1009, 1014-1015.)

As discussed above, instruction on voluntary intoxication was unsupported by the evidence, and the instruction given on the lying in wait murder charge and that on the lying in wait special circumstance allegation were correct. Accordingly, appellant's counsel was not remiss in failing to request instruction on these subjects. (See, e.g., *People v. Moles* (1970) 10 Cal.App.3d 611, 618 [counsel not ineffective where evidence "not warrant such instructions"].)

5.    *Evidence of Lying In Wait Murder and Special Circumstance Substantial*

Appellant contends the evidence is insufficient to sustain his conviction of lying in wait murder and the lying in wait special circumstance finding. We find the evidence substantial.

"[T]he standard of review is settled. 'A reviewing court faced with such a claim determines "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime

13

beyond a reasonable doubt." [Citations.] We examine the record to determine "whether it shows evidence that is reasonable, credible and of solid value from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] Further, "the appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."' [Citation.]

"The applicable principles are set out in *People v. Carpenter* (1997) 15 Cal.4th 312. 'The requirements of lying in wait for first degree murder under . . . section 189 are "slightly different" from the lying-in-wait special circumstance under . . . section 190.2, subdivision (a)(15). [Citation.] . . . We focus on the special circumstance because it contains the more stringent requirements. [Citation.] If, as we find, the evidence supports the special circumstance, it necessarily supports the theory of first degree murder. [¶] The lying-in-wait special circumstance requires "an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage . . . ." [Citations.] "The element of concealment is satisfied by a showing '"that a defendant's true intent and purpose were concealed by his actions or conduct. It is not required that he be literally concealed from view before he attacks the victim."'" [Citation.]' [Citations.]" (*People v. Moon* (2005) 37 Cal.4th 1, 21-22; accord, *People v. Mendoza* (2011) 52 Cal.4th 1056, 1072-1073.) "'Furthermore, the lying-in-wait special circumstance requires "that the killing take place *during the period of concealment and watchful waiting*.'" [Citation.]" (*People v. Cruz* (2008) 44 Cal.4th 636, 679.)

"As for the watching and waiting element, the purpose of this requirement 'is to distinguish those cases in which a defendant acts insidiously from those in which he acts out of rash impulse. [Citation.] This period need not continue for any particular length '"of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation."' [Citation.]' [Citation, fn. omitted.] 'The factors of concealing murderous intent, and striking from a position of advantage and surprise, "are

the hallmark of a murder by lying in wait." [Citation.]' [ Citation.]" (*People v. Mendoza*, *supra*, 52 Cal.4th 1056, 1073.)

These elements are satisfied on this record. Appellant dressed himself in black and dark clothing and arrived at Tony's house before dawn. He compelled Chie to accompany him and used her as a "stalking horse" to lure out Tony while he awaited concealed in the carport for an opportunity to catch Tony unawares. Although Chie warned Tony appellant was "outside," she did not tell him appellant was in the adjacent carport and holding a knife. Also, Tony was unaware appellant was concealed in his carport when Tony exited the front door to let Chie out the locked gate or when he re-entered his house and closed the door. Shortly after Tony's return into his bedroom, his housekeeper heard banging consistent with a fight. Opening the carport door, she saw a man, who had an arm around Tony's neck, stabbing him from behind. The jury was entitled to infer that appellant, through some subterfuge like tapping on his bedroom window and rapidly stepping away to hide, caused Tony, who was in his boxer shorts and barefoot, to exit and investigate what was happening and that once he was in the carport area, appellant launched his stealth attack from behind on the unsuspecting Tony. These circumstances support both appellant's lying in wait murder conviction and the lying in wait special circumstance finding.

DISPOSITION

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

BOREN, P.J.

We concur:

ASHMANN-GERST, J.

CHAVEZ, J.

15